HENRY DILLON WINSHIP, TRANSFEREE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HENRY DILLON WINSHIP, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

KATHERINE WINSHIP HAYES, TRANSFEREE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 6713, 6714, 6720. Promulgated March 31, 1947.

*Edgar T. Zook, Esq.*, and *Robert M. Gane, C. P. A.*, for the petitioners.

*Earl C. Crouter, Esq.*, for the respondent.

Harron, *Judge*: *Issue I.*—The question under this issue relates to the individual income tax liability of Henry Dillon Winship for the taxable year 1941. Respondent determined that petitioner was not entitled to a deduction in 1941 for a carry-over of a net operating loss sustained in 1940. In 1940 petitioner, as executor of his father's estate, sold all the remaining assets of the estate. Petitioner contends that at that time the estate of his father was indebted to the revocable trust, which he and his sister set up, in the sum of $130,029.36. This sum represented moneys which the father had advanced to himself when he was executor of the estate of petitioner's mother and as trustee of the testamentary trust. It also represented moneys advanced to the father and to the father's estate by the first and second *inter vivos* trusts.

The moneys advanced to the father had been charged on the books of the estate and trusts to the personal account of the father. The advancements extended back to the time of the death of petitioner's mother in 1920. In 1930 a balance was struck by petitioner, his sister, and his father, under which they agreed that the father owed to the first *inter vivos* trust which petitioner and his sister set up the sum of approximately $61,500. Prior to his death in 1931, the father became indebted to the trust in the further amount of approximately $51,000, and the remaining $17,000 represented money advanced by the trust to the estate of the father and interest at the rate of 6 per cent on the unpaid balance.

Although the father died in 1931, petitioner claims that the debt was a valid obligation and enforceable against the estate of the father up until the time the estate disposed of all of its assets in 1940 for a little over $1,000. At this time, claims petitioner, the debt became worthless and allowable as a deduction for the revocable trust which he and his sister had set up in 1939. The parties are agreed that since the trust was revocable the deductions allowable to the trust are allowable to petitioner in his individual capacity. Petitioner contends, therefore, that the bad debt deduction in 1940 was a net operating loss deduction, one-half of which was allocable to him as one of the two grantors of the revocable trust, and that he is entitled to carry over such deduction for purposes of computing his 1941 income tax liability.

Respondent, on the other hand, contends that the debt became worthless prior to 1940. In addition, he argues that the bad debt deduction, even if the claim against the father was considered valid in 1940, was not attributable to the operation of a trade or business regularly carried on by either the revocable trust or petitioner as an individual. Under such circumstances, he claims that the net operating loss deduction for 1940 is allowable under section 122 (d) (5) of

the Internal Revenue Code only to the extent of the amount of gross income not derived from such trade or business. It appears that this limitation would allow petitioner no net operating loss carry-over for the year 1941.

We think that respondent's position is correct. Even assuming, *arguendo*, that the claim against the estate of petitioner's father was not barred by the statute of limitations or voluntarily abandoned by petitioner and his sister, it seems perfectly clear that the claim for which the bad debt deduction was sought was in no way attributable to the operation of a trade or business regularly carried on by petitioner individually or by the revocable trust of which he was a grantor. The father apparently invested the funds which were advanced to him in corporations which he organized for developing patents and for mining and marketing mineral deposits. But neither petitioner nor the trusts had any interest in the corporations or in what the father did with the money given to him. This is not a case where the trusts lost money in managing the various real estate holdings comprising the corpus of the trusts. Any business which the father carried on with the money advanced to him was his own and can not be attributable either to the trusts or to petitioner. This is evident from the fact that petitioner treats the $130,020.36 as a debt owed by the father to the trusts, and not as a loss from the operations of any of the corporations. Accordingly, even assuming that one-half of the $130,029.36 was deductible by petitioner in his 1940 income tax return as a bad debt, this could only offset gross income not derived from a trade or business regularly carried on, for purposes of computing the net operating loss carry-over under section 122.

It is held that petitioner is entitled to no net operating loss carry-over deduction for the calendar year 1941.

*Issue II.*—This issue also relates to the individual income tax liability of petitioner Henry Dillon Winship. The question is whether dividends which petitioner received from Automotive Engineering Corporation in 1941 were taxable solely to petitioner as separate income, or taxable one-half to petitioner and one-half to his wife as community income. This depends on whether petitioner owned the Automotive stock as separate property or community property.

Petitioner was married and domiciled in California prior to the taxable year. The stock in question was part of the estate of petitioner's deceased father. Petitioner was one of the three principal legatees under the will of his father. Petitioner was also executor of the estate. There is no question that, if petitioner, as executor, had distributed the stock to the legatees under the will, he would have acquired his interest by bequest and the stock would have constituted his separate property under California law. However, peti-

tioner did not distribute the stock as part of the estate of his father. Instead he caused it to be sold and purchased on behalf of himself and his sister for the bid price of $1,000.

The sale took place in 1940. Petitioner was designated on the books of the corporation as the owner of 475 shares of the 950 shares sold; the other shares were placed in the name of his sister. In 1941 the dividends which give rise to the present controversy were declared and paid by the corporation.

At the time petitioner received the dividend income in question he had, under his own testimony and the evidence in the record, not made any payment whatsoever for the stock. It was not until 1943, after his 1941 income tax return was under examination, that petitioner claims to have paid for the stock by paying attorney and accounting fees in connection with his father's estate in the approximate sum of $1,500. These fees were paid by petitioner's personal checks, which were drawn on a bank account which contained an undisclosed sum representing in part salaries of petitioner, some of the dividends in question, and the proceeds from the sale of the Automotive stock. Petitioner's sister apparently reimbursed him for part of the fees paid as her contribution to the cost of the stock.

Respondent determined that petitioner had not acquired the stock as community property prior to or during the taxable year 1941.

Petitioner claims that the stock was not acquired by gift or devise and claims that respondent has offered no testimony whatsoever to overcome the presumption that the stock acquired was community property.

It seems clear that, in so far as the taxable year 1941 is involved, petitioner must rely solely on the presumption in the California law that property acquired during the marriage is community property unless it is acquired by gift, devise, or purchase with the proceeds of separate property. *Alanson Weeks*, 31 B. T. A. 627. The payment of the attorney and accounting fees is of doubtful materiality. The payment was made after the taxable year and at a time when the taxpayer's 1941 income tax return was under examination. Moreover, it has not been shown to what extent the funds in the bank account on which the checks were drawn represented petitioner's separate or community property. It is true that salaries of petitioner were deposited in the account, but the account also reflected deposits of the dividends and proceeds from the sale of the Automotive stock, the nature of which is the question at issue. The source of the payments, therefore, is not sufficient evidence to overcome the presumption of correctness of respondent's determination. *Shea* v. *Commissioner*, 81 Fed. (2d) 937.

Moreover, we do not think the situation falls within the ambit of those cases which hold that the acquisition of property on credit in

California is presumed to be purchased on community credit and, therefore, community property. See *Alanson Weeks, supra; Bechtel v. Commissioner*, 34 B. T. A. 824. In the instant case, petitioner never intended to, nor did he, purchase the Automotive stock on credit. His failure to pay for the stock immediately can be explained, in part only, for the reason that he was the executor to whom payment was to be made. The stock was worth more than one hundred times the amount which petitioner paid for it. He and his sister were rightfully entitled to two-thirds of the stock by inheritance and he must have believed that the purchase for the nominal amount of $1,000 was an easy way to facilitate distribution of the stock, even though, in fact, it cut out the rights of the third legatee under the will. In any event, regardless of petitioner's motives, all petitioner can point to in the taxable year 1941 is that he had acquired the Automotive stock after his marriage. Although technically he may not have acquired it by gift or bequest, he also did not acquire it by the use of community funds or community credit. Since the stock was worth so much more than the price at which petitioner bid it in, there is just as much an element of gift from himself as executor to himself as an individual as there is a purchase. Under such circumstances, even if conflicting presumptions exist, the determination of the Commissioner must prevail. *J. Z. Todd*, 3 T. C. 643; affirmed and remanded, 153 Fed. (2d) 553.

It is held that the respondent's determination that petitioner was taxable on all the dividends received from Automotive Engineering Corporation in the calendar year 1941 as separate income is sustained.

*Issue III.*—This issue relates to the transferee liability of petitioner Henry Dillon Winship and petitioner Katherine Winship Hayes. Petitioners concede that they are liable as transferees for any deficiency in tax of the Automotive Engineering Corporation. The question is whether Automotive was liable for a declared value excess profits tax for the calendar year 1942. This depends on whether Automotive was carrying on or doing business for any part of the year ended June 30, 1942, so as to be subject to the capital stock tax. *Rotorite Corporation*, 40 B. T. A. 1304; reversed on other grounds, 117 Fed. (2d) 245.

Automotive was organized in 1930 by petitioner's father, Emory Winship. In the formation of the corporation Emory Winship transferred to the corporation various patents held by him and the Eight Wheel Motor Vehicle Co. relating to multiwheel vehicles in exchange for all of the corporate stock. The main purpose for which the corporation was organized was to license the use of these patents to other companies for royalties.

The crucial period involved is July 1, 1941, to June 30, 1942. To be subject to the capital stock tax the corporation must actually have been carrying on or doing business during any part of this period. *Sears* v. *Hassett*, 111 Fed. (2d) 961.

In October 1941, which is within the period in question, Automotive entered into a licensing agreement with the Timken Detroit Axle Co., whereby Timken agreed to pay Automotive royalties in return for the exclusive right to use, manufacture, and sell multiwheel units or other equipment embodying the patents and inventions belonging to Automotive. From 1932 on, Timken had been about the only source of revenue for Automotive. The 1941 contract was a modification of the contract previously existing between Automotive and Timken which had been entered into in 1935.

The October 1941 Timken-Automotive licensing agreement did not cover all the patents held by Automotive. Petitioner had acquired other patents, pertaining to hydraulic transmissions and pumps. These patents were generally of little value. No royalties had ever been received on these patents. However, in October 1941 Automotive still maintained an organization capable of marketing these products.

It was not until February 1942 that Automotive was served with an order of the War Department to turn over the patents and assets covered by its licensing agreement with Timken to the Government, and it was not until later in the year 1942 that the company decided to liquidate and dissolve.

Automotive was organized for profit. It was organized for the purpose of licensing its patents and receiving the royalties for the benefit of its shareholders. In making the October 1941 licensing agreement with Timken, under which Automotive received its only source of revenue prior to the sale and disposal of its assets, Automotive was doing exactly what it was organized to do. As was said by the court in *Section Seven Corporation* v. *Anglin*, 136 Fed. (2d) 155:

If a corporation is organized for profit and was doing what it was principally organized to do in order to realize profit, no special volume of business is necessary to bring it within the taxing act—a very slight activity may be deemed sufficient to constitute "doing business."

The making of the October 1941 licensing agreement was doing or carrying on business. It required the exercise of business judgment. Although a licensing agreement previously existed between Automotive and Timken, the new agreement was nevertheless a modification of the old and was expressly to be interpreted without reference to the earlier agreement. Having made a contract which constituted its only source of revenue during the period in question, Automotive can not say that in doing what it was expressly authorized and organized to do it was not carrying on or doing business for profit. *Section Seven Corporation* v. *Anglin, supra.*

In addition, Automotive held itself in readiness to market and license its other patents which were not covered by the Timken agreement. It claimed business expense deductions in the returns

which it filed during the period. Under all the circumstances, we are of the opinion that its activities consisted of more than receiving royalties and distributing them to its stockholders. Cf. *Rotorite Corporation, supra.* Hence, the regulation upon which petitioners rely to the effect that a corporation is not doing business if it has retired from the business for which it was organized and has reduced its activities to the mere ownership and holding of property and the distribution of its avails, is not applicable. Petitioner had not retired from the business for which it was organized. It was organized to make licensing agreements and this is what it did during the period in question.

It is held that Automotive was carrying on or doing business during the one year period ended June 30, 1942, so as to be subject to the capital stock tax. Since Automotive was subject to the capital stock tax, it is also subject to the declared value excess profits tax for the calendar year 1942. Respondent's determination that petitioners are liable as transferees of the Automotive Engineering Corporation for the deficiency in declared value excess profits tax for the calendar year 1942 is sustained.

An issue raised in the petition that the $130,029.36 owed by Emory Winship to petitioners entered into the cost basis of the patents sold by Automotive to the Government in 1942 has been abandoned by petitioners on brief.

*Decisions will be entered for the respondent.*