E. C. OLSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9201. Promulgated March 17, 1948.

*Benjamin F. Kizer, Esq.,* and *George Kinnear, Esq.,* for the petitioner.

*T. M. Mather, Esq.,* for the respondent.

HARLAN, *Judge*: This proceeding involves a deficiency in income tax for the calendar year 1941 in the amount of $28,512.05.

We are asked to determine:

(1) Whether the Commissioner erred in determining that the stock of the Trask-Willamette Co. became worthless prior to 1941.

(2) Whether the Commissioner erred in disallowing a bad debt deduction in connection with the Trask-Willamette note.

(3) Whether the Commissioner erred in determining that the profit from the sale of the Keeler Creek logging contract was petitioner's separate income.

(4) Whether the Commissioner erred in determining that the income from Priest River operation was part separate and part community income.

In the interest of clarity and convenience we shall consider the facts and the law pertaining to issues I and II together and issues III and IV separately.

### ISSUES I AND II.—FINDINGS OF FACT.

Petitioner is an individual, residing in Spokane, Washington. He filed the income tax return involved herein with the collector of internal revenue at Tacoma, Washington.

For many years prior to 1932 petitioner had been engaged in the logging and sawmill industry in the territory adjacent to Spokane, most of that time being spent as an employee of the Diamond Match Co. From 1932 to 1941 he was in the lumber business for himself and in the latter year formed a partnership.

In 1937 petitioner married a widow, Marion Burr, whose only separate property consisted of a very small income from a trust fund. At the time of the marriage petitioner had a lumbering plant in Idaho known as the Priest River operation, in which he had invested approximately $50,000. In addition thereto he had real property in Washington, notes, stocks, and bonds of an additional value of approximately $50,000.

In 1935 petitioner with two others incorporated the Trask-Willamette Co. for the purpose of logging timber partially damaged by fire in a tract in Oregon, and petitioner purchased 250 shares of its stock, of the value of $25,000. Much of the equipment procured by the company was covered by a chattel mortgage to the Bank of California. The other assets of the corporation consisted of the timber contract permitting the logging of the territory. This contract covered approximately a billion feet of fir timber at a very advantageous price to the corporation. The early operations of the corporation, however, resulted in a substantial operating deficit prior to 1939. In that year a second fire attacked the lumber tract and destroyed

a number of railroad bridges on the only railroad supplying transportation to this tract. In this fire much of the corporation's mortgaged equipment was destroyed. In September 1940 the bank brought foreclosure proceedings, and after the purchase of the equipment by the mortgagee at the foreclosure sale there was a deficiency approximating $24,000. The foreclosure sale was confirmed November 13, 1940. The equipment was not removed from the camp site until June 1941. The resumption of this logging operation would have required additional capital to procure this equipment and either a rebuilding of the railroad or the procurement of trucks and a roadway for the shipment of logs.

At the end of 1940 the only asset retained by Trask-Willamette was the timber contract. During 1941 all prospects of repairing the railroad had vanished, the railway equipment was sold, the receiver discharged, and Trask-Willamette rejected the idea of constructing a road to remove the logs by truck. In March of 1941 petitioner disposed of his stock in the corporation to one of his associates in the enterprise for a nominal consideration of $1. He claimed a capital loss in 1941. The stock of Trask-Willamette became wholly worthless during 1941.

In 1935 petitioner also loaned Trask-Willamette $25,000 and received a note secured by a chattel mortgage on some of the logging equipment, together with an assignment of a one-half interest in a logging venture in Skamania, Washington.

Trask-Willamette and the Alaska Junk Co., who together owned the entire venture, had contracted with a lumber operator to log the timber and pay them stumpage. Because of the depressed price of lumber prior to and during 1941, the contractor had discontinued logging and disclaimed all future interest in the operation.

Prior to 1941 petitioner had realized funds from the sale of the mortgaged equipment, so that the unpaid balance in 1941 was $8,969.30. He endeavored to realize additional funds by selling his half interest in the Skamania logging venture to the owner of the other half, but the depressed condition of the lumber market made the project undesirable and no sale was effected.

Petitioner concluded that additional recovery on the note was not to be anticipated and charged off the balance due as a bad debt. However, in the period from 1942 to 1946, inclusive, our involvement in the World War and our subsequent recovery activities so improved the lumber business that petitioner began to realize payments on the Skamania project and was paid the final balance owing in 1946.

Based upon the facts available to petitioner during 1941 and prior to the filing of his income tax return for 1941, the security of his claim against Trask-Willamette growing out of his loan to that

Company became worthless in 1941 and his claim also became worthless during that year.

Petitioner's net taxable income for 1940 was $20,610.18. In 1941, if the capital loss and bad debt deductions were not allowed, his net taxable income would have been $23,228.23.

OPINION.

The petitioner testified that even after the 1939 fire and the sale of the equipment in 1940 he still thought the lumbering rights of Trask-Willamette were of such a profitable character that he considered the possibility of constructing a road into the site and removing the lumber by truck. The receiver of the railway company meantime was energetically endeavoring to refinance the railroad. He did not give up his efforts and file his final report until August of 1941.

All of the evidence shows that the petitioner was an outstanding man in the lumber business, whose judgment was considered sound by leaders in that field. Furthermore, in the case at bar, the petitioner gained no material tax advantage for himself by selling his stock in 1941 rather than in 1940, since his taxable income in those two years was substantially the same if the Trask-Willamette losses are not taken into consideration. Should we join with the Commissioner in a hindsight view, it does seem that after the equipment foreclosure sale in 1940 there was not much value left in Trask-Willamette stock. However, due to the advance of war prices in lumber and the advantageous price which Trask-Willamette had on stumpage, our hindsight now tells us that, if petitioner and his associates had persisted into the war years, Trask-Willamette would doubtless have been really profitable. In 1940 and 1941 all such questions were conjectures into the future and we would be most reluctant to say that the petitioner was not justified in taking his capital loss in 1941.

The only difference in the material facts between the Trask-Willamette capital loss and the Trask-Willamette bad debt is that the petitioner, after some effort, was unable to sell the last of his security for the indebtedness consisting of a half interest in a lumber venture in Washington. He retained this security, which at the time he deemed of no value. However, due to war and post-war price increases, he did eventually recover practically all of the bad debt loss. These recoveries he treated as income when received.

Respondent, by his brief, admits that if the security for the bad debt was worthless, its retention by the taxpayer does not defeat the right to a bad debt deduction.

The Commissioner, in his determination of deficiency herein, denied the taxpayer's claimed deduction for the Trask-Willamette bad debt

in the following words: "It is held that the obligation due from the Trask-Willamette Company became worthless prior to 1941." In his brief the Commissioner argues that the security had value in 1941 and therefore the loss had not yet occurred in that year.

From all of the record it is our conclusion that both the stock in Trask-Willamette and the security back of the Trask-Willamette debt had some prospective value on January 1, 1941; that within the limits of reasonable judgment both of these items became worthless during 1941; and that petitioner is entitled to a deduction thereby.

ISSUE III.—FINDINGS OF FACT.

In the summer of 1940 the United States Forest Service offered for sale a stand of timber in the Kootenai National Forest in the Keeler Creek drainage near Troy, Montana. At the suggestion of one Lammers, petitioner filed a bid to purchase this standing timber and Lammers and the petitioner agreed to form a partnership for the promotion of this enterprise, in which petitioner was to have a 50 per cent interest, Lammers a 20 per cent interest, John Scott Olson a 20 per cent interest, and W. B. Olson a 10 per cent interest, the two latter individuals being sons of the petitioner by his first marriage. With his bid the petitioner deposited $8,000, which he agreed should be applied as a first payment on the purchase of the timber if his bid should be accepted. The deposit was made by petitioner on behalf of the partnership. It was borrowed by petitioner from his bank.

Petitioner's bid was accepted and in January 1941 the partnership of E. C. Olson & Sons was formed pursuant to agreement. Petitioner assigned to the partnership his contract to purchase the Keeler Creek timber and petitioner's wife signed the following agreement, which was attached to the articles of partnership:

I, Marion B. Olson, do hereby consent to the assignment of the timber cutting agreement above set forth and do hereby assign and convey the same in so far as it may be necessary or desirable to convey and assign my community interest.

On January 30, 1941, the partnership accepted from the J. Neils Lumber Co. an offer to sell their contract to buy the Keeler Creek lumber for $150,000 plus a return of the $8,000 deposited with the bid. The $150,000 was divided among the members of the partnership and petitioner reported one-half thereof, or $75,522.64, as a short term capital gain, which he treated as community property, paying a capital gain tax on one-half thereof.

The respondent determined that the $8,000 was petitioner's separate capital, that no part of the short term capital gain of $74,522.64 represented community income, and that the full amount was taxable to petitioner.

OPINION.

The petitioner contends that his interest in the profit from the sale of the Keeler Creek timber contract received in 1941 arose from his personal services which were community property, and from borrowed money, likewise a community asset, and that, therefore, the whole profit of $74,522.64 was community income.

The respondent contends that the profit resulted from the purchase and sale of property; that the element of personal service is not involved; that the funds used to purchase the contract were borrowed on the separate credit of petitioner and were his separate funds; and that petitioner's share of the profit from the sale of the contract was his separate income.

We agree with the respondent that the element of personal service has no bearing on the question before us. Undoubtedly petitioner's background of training and experience in dealing in timber and in conducting lumbering operations made it possible for him to exercise good judgment and make an advantageous bid, and the fact that he was an experienced and reliable operator was taken into consideration by the Forest Service in awarding him the contract. There was, however, no requirement that any personal service be rendered by petitioner in order to get the contract, and none was rendered that would justify treating any part of the gain resulting from the purchase and sale of property as compensation received for personal service rendered. Petitioner received the contract because he made the highest bid.

Petitioner also urges that he borrowed the $8,000 he used to make the deposit at the time of his bid from the Old National Bank, and that, inasmuch as this transaction began three years after his marriage, the borrowing must be deemed to be upon community credit.

The courts of the State of Washington have uniformly held that money borrowed by a husband is presumed to be community property and that the property acquired with such borrowed money is presumed to be community property, but these presumptions are rebuttable. *United States Fidelity & Guaranty Co.* v. *Lee,* 58 Wash. 16; 107 Pac. 870; *Katterhagen* v. *Meister,* 75 Wash. 112; 134 Pac. 673; *In re Finn's Estate,* 106 Wash. 137; 179 Pac. 103. Where, as here, the Commissioner determines that the borrowed money and the property acquired were the separate property of petitioner, his determination "effectually overcomes the ordinary presumptions of law, and the petitioners continue to have the duty of going forward with their proof. *Shea* v. *Commissioner,* 81 Fed. (2d) 937." *J. Z. Todd,* 3 T. C. 643; affirmed and remanded, 153 Fed. (2d) 553; *Henry Dillon Winship,* 8 T. C. 744. At the trial, the petitioner testified as follows:

Q. After entering upon that agreement among the four of you at the time

of making that agreement, what did you do with reference to procuring the timber, Mr. Olson?

A. Well, we made a bid on the Government timber that was advertised for sale, the so-called Keeler Creek Timber.

Q. And how much were you obliged to pay as an advance on stumpage at the time that your bid was accepted?

A. Well, it required a payment of $8,000.

Q. Yes, and under what circumstances was that $8,000 procured and paid?

A. Well, I paid the $8,000 myself. It was a personal payment. I got it from the bank—that is, I borrowed it from the bank and made the payment myself. Mr. Lammers didn't put up any interest at that time. I told him that inasmuch as we would know before the day was over whether or not we were the successful bidders; that I would put up the whole amount and that he could repay me if we were successful in bidding; and the same with the boy. That was the understanding, that I was to put up the money for the initial payment.

Q. And pursuant to that, you made this borrowing at the Old National Bank and put it up, did you?

A. Yes; that's right.

On re-cross-examination he testified:

Q. Mr. Olson, in connection with your borrowings at the bank, did you ever give security?

A. Yes, at times.

Q. And what security was given on your borrowings?

A. Well, sometimes stock, perhaps, and other times bonds. I don't recall everything during all those years, but it was different, various——

Q. Were you required to make financial statements to the bank?

A. Well, I don't remember whether I have or not. I imagine I have, because the banks don't usually loan money without it. I imagine I have made a lot of statements to the bank.

Q. Yes, and you don't have copies of any of those statements, do you?

A. No, I haven't.

Q. Did Mrs. Olson sign these statements, these financial statements that you——

A. No, I don't think so.

Q. And do you know when the stocks that you put up as collateral were acquired by you?

A. No, I don't recall now from memory.

Q. On your borrowings at the bank, you say those were primarily notes—90-day notes?

A. They might be for 30 or 60 or 90; not over 90, I don't think.

Q. By whom were the notes signed?

A. By me.

Q. Were any of them signed by Mrs. Olson?

A. No.

This testimony, considered in conjunction with all other testimony and evidence in the record, does not convince us that the Commissioner's determination was in error. On the contrary, it indicates that petitioner borrowed the $8,000, that any notes given were his personal notes, and that any security given was his separate property. Under the circumstances, our conclusion is that the petitioner invested his separate funds in the timber contract; that it became his separate property and that of his partners; and that his distributable share of

the profit realized when it was sold to the J. Neils Lumber Co. in January 1941 is his separate income and taxable as such.

### ISSUE IV.—FINDINGS OF FACT.

In 1932 petitioner purchased a stand of timber in the Priest River territory in Idaho and constructed on the property a sawmill plant, power plant, miscellaneous buildings, roads, etc., at a total cost to him of $50,000.

From 1932 to 1941 his profits from this operation averaged $33,500 per year. He is a top-flight operator and, when employed prior to 1932 by the Diamond Match Co. in charge of their sawmill operations, had an average income of $18,500 per year from 1924 to 1933.

In any lumbering activity large enough to warrant the use of petitioner's ability he would reasonably command a salary of from $20,000 to $25,000 per year, as the lumbering business is a hazardous operation, where experience and executive ability are the predominant factor in success.

The banking business for the Priest River operation was carried on at the Old National Bank of Spokane, where petitioner's private funds and community funds were mingled with those actively used in the Priest River operation. At said bank he also had a second account, for the use of small personal items. From 1937 to 1941 he borrowed a total of $44,000 in connection with his Priest River operations. He never allocated to himself any salary, but provided a drawing account of $500 per month to cover living expenses.

On February 28, 1941, the assets of the Priest River operation were transferred to a partnership consisting of petitioner and his two sons.

In his return for 1941 petitioner reported $4,672.29 as separate income from the Priest River operation, of which $874.31 represented net profit from the Priest River operation prior to the formation of the partnership on February 28, 1941.

Shortly after petitioner's marriage he and his wife agreed that the income from the Priest River operation should be treated as community property, and subsequent thereto family expenses were paid out of this income. In about the year 1938 the Olsons instructed their accountant to file Idaho and Federal income tax returns treating the Priest River income as community income. The State of Idaho accepted these returns without question. In 1939 petitioner and his wife asked for and procured a written opinion from their attorney in which they were advised that the Priest River income was community income.

### OPINION.

The Commissioner determined that the Priest River income was

separate income to the taxpayer and in the notice of deficiency said:

It is held that all of the capital invested in the partnership operating a lumber mill at Priest River, Idaho, represents your separate property and that the status of the income derived from that source may be determined in accordance with the laws of your domicile, i. e., the State of Washington. Accordingly, only that portion of the income from said business which is attributable to your personal services constitutes community income. It is further held that $6,000.00 represents reasonable compensation for the services rendered and that 8% represents a fair rate of return on the capital invested in the business.

The petitioner takes issue categorically with all of the statements in this notice of deficiency. He contends that the income is determined by the law of Idaho, which is the situs of the property; that the money invested in the Priest River plant during the taxable year was community money, inasmuch as his general investments had been so commingled with community property as to be undistinguishable; that practically the whole of the profits from said venture were due to his personal services; and that if he is to be awarded a salary, $6,000 is wholly inadequate. These points are all treated extensively in the briefs. However, the petitioner also contends that shortly after his marriage he and his wife agreed that the income from the Priest River operation should be community income and that it has been so treated by them ever since.

Both parties agree that if such an agreement was entered into, regardless of the general nature of the income, it became community income by virtue of this agreement.

At the time of the hearing the following colloquy occurred between counsel for the Commissioner and the Court:

THE COURT. Could the parties * * * change the nature of that property [income from the Priest River operation] for the purpose of tax liability by any oral agreement?

MR. MATHER. Absolutely. They could change the character of the property or the income, either one, from separate to community.

THE COURT. Even though the law of Washington would ordinarily make it separate income, they could change it to community income by an oral agreement?

MR. MATHER. That is correct.

This Court has held that a change of separate personal property to community property could be effected in California by an oral agreement. See *Estate of Joe Crail*, 46 B. T. A. 658. In a number of decisions by the state courts in Washington it has been repeatedly held that personal property and income can be converted from community to separate property by an oral agreement. See *Union Securities Co.* v. *Smith*, 160 Pac. 304; *Yake* v. *Pugh*, 42 Pac. 528; *Meyers* v. *Walker*, 24 Pac. (2d) 97. In fact, the headnote on G. C. M. 19248, C. B. 1937–2, p. 59, says:

Where a husband and wife residing in the State of Washington [so] agree

\* \* \* orally, it changes the status of subsequently acquired personal property to community property.

The agreement in the Olson case was made in 1937, shortly after the marriage, and it applied to all subsequent income from the Priest River property.

In the case at bar, however, the respondent declares that the Court can not consider such agreement because no agreement was pleaded in the petition. Paragraph 5 (f) of the petition contains the allegation that "Petitioner and his wife have at all times since his marriage treated the entire income of the Priest River lumber operation as their community property."

It seems obvious to the Court that if the taxpayer treated his own separate income as community income, thereby devoting one-half thereof, after deducting community expenses, to his wife, he must have done so by agreement, or involuntarily through duress exercised by the wife on him. There is no testimony of duress in this case and nothing on which a faint inference could be drawn. Therefore the Court can come only to the conclusion that the word "treated" as used in this petition embraces "agreed" and that the testimony on this point is admissible.

The Commissioner at the trial contended that such an interpretation occasioned a surprise to the Commissioner. However, it was clearly established by the testimony that this question of the agreement of the taxpayer and his wife had frequently been discussed by counsel preparatory to the trial of this case, and we can find no basis in this record for surprise.

The Commissioner relies upon the case of *Blair* v. *Roth*, 22 Fed. (2d) 932, which was a case in which the taxpayer introduced evidence following many leading questions which was decidedly at variance with the allegations of his petition and the court held that such evidence was not admissible under the petition as drawn. That case is clearly distinguishable from the case at bar. In the case at bar we have the testimony of the taxpayer and his wife that such an agreement was made and the testimony of the accountant that the taxpayer and his wife instructed him to file returns showing the Priest River property to be community property, and we have the written opinion of the taxpayer's lawyer to the taxpayer in 1939 declaring that such a treatment of the Priest River income was within the law.

It is true that for the first two months of the taxable year, prior to the partnership, the taxpayer did return this income as his separate income, but for the last ten months thereof he returned it as community income. It is also in evidence that in the year 1940 the petitioner paid "additional income taxes" totaling $4,662.30, plus interest. The record in this case leaves the Court uninformed as to how the Commissioner

had treated the taxation of the income from the Priest River operation in past taxable years. We know from the testimony of the accountant that the income tax returns had been filed by the taxpayer on a community property basis and that state income tax returns filed on this basis were accepted by the State of Idaho, but there is no testimony as to how they were treated by the Federal Government, nor was the income tax return for 1940 introduced in evidence. All that we know is that petitioner consulted his lawyer with reference to his tax status, that he paid an additional tax for 1940, and that for the first few months of 1941 he filed his return prior to the creation of the partnership as though this income were his separate income. In view of our finding, however, that the petitioner and his wife had entered into a definite agreement that the Priest River income should be community income, we can not hold that the mere fact that this taxpayer paid an additional tax in 1940 rather than become involved in litigation at that time is of sufficient weight to overcome the testimony in the record that the petitioner and his wife had actually agreed about their Priest River income. If such an agreement was made, it would remain in force until changed by the parties. It would not be changed merely by the taxpayer deferring to the insistence of the Commissioner on a question of income tax.

It is therefore our conclusion that the Priest River income in the taxable year 1941 was community property.

*Decision will be entered under Rule 50.*